## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| ANTONIO ISAAC ALEXANDER, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CAUSE NO. 1:26-cv- 00183 |
| RYNE KIRCHBERG, individually; | § | |
| SHALOM ALVAREZ, individually; and | § | |
| CITY OF AUSTIN, TEXAS, | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Antonio Isaac Alexander, by and through undersigned counsel, and pursuant to the Federal Rules of Civil Procedure, brings this action against the above-named Defendants and, in support thereof, respectfully alleges as follows:

## I.    INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983, alleging that Defendants Ryne Kirchberg and Shalom Alvarez, commissioned police officers of the Austin Police Department, acting under color of state law, violated Plaintiff's constitutional rights when they unlawfully seized and arrested him on July 30, 2024, using excessive force without justification. Defendant City of Austin is sued for its deliberate indifference to a documented pattern of misconduct by Officer Kirchberg, coupled with systemic failures in investigation, discipline, and accountability that created the conditions for the constitutional violations that occurred.

2. What began as a stop for an alleged pedestrian infraction crossing mid-block rather than at a designated crosswalk escalated within seconds into a violent takedown, physical restraint, and arrest, all captured on body-worn camera and dash-camera footage. The criminal charge against Mr. Alexander was subsequently dismissed by the Travis County Attorney's Office. Plaintiff alleges that the dismissal, together with the facts documented in APD records, is consistent with a lack of probable cause for the arrest.

3. The events of July 30, 2024, occurred in a context where the City of Austin was on actual and explicit notice, through the Office of Police Oversight's August 19, 2024 "Memorandum of Concern," that Officer Kirchberg exhibited a documented pattern of policy violations and concerning decision-making, and that his chain of command had failed to hold him adequately accountable. Plaintiff further alleges that, notwithstanding the Memorandum of Concern, APD Internal Affairs classified Mr. Alexander's complaint as "Class D" and closed it administratively with no further investigation, which Plaintiff contends constituted ratification and deliberate indifference to the risk of future constitutional violations.

## II.   JURISDICTION AND VENUE

4. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1983 (civil action for deprivation of constitutional rights under color of state law).

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as such claims form part of the same case or controversy as Plaintiff's federal claims.

6. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Travis County, Texas, within the Austin Division of the Western District of Texas, on July 30, 2024.

## III.   PARTIES

7. Plaintiff Antonio Isaac Alexander is an adult resident of Travis County, Texas, domiciled at 1817 E. Oltorf Street, Apartment 2034, Austin, Texas 78741.

8. Defendant Ryne Kirchberg ("Officer Kirchberg") is, and was at all relevant times, a commissioned police officer employed by the Austin Police Department, State of Texas, with badge number AP9241. Defendant Kirchberg is sued in his individual capacity. At all times relevant to this Complaint, Defendant Kirchberg acted under color of state law by virtue of his official capacity as a police officer.

9. Defendant Shalom Alvarez ("Officer Alvarez") is, and was at all relevant times, a commissioned police officer employed by the Austin Police Department, State of Texas, with badge number AP9207. Defendant Alvarez is sued in his individual capacity. At all times relevant to this Complaint, Defendant Alvarez acted under color of state law by virtue of his official capacity as a police officer.

10. Defendants Kirchberg and Alvarez will be served pursuant to Fed. R. Civ. P. 4(e) at addresses to be confirmed and reflected on the summonses issued by the Clerk

11. Defendant City of Austin, Texas is a home-rule municipality organized under the laws of the State of Texas, chartered to exercise municipal governance and police power within Travis County. The City of Austin is a legal entity capable of suit and being sued. The City of Austin is responsible for the hiring, training, supervision, and discipline of members of the Austin Police Department, including Defendants Kirchberg and Alvarez. The City of Austin is further responsible for establishing, implementing, and maintaining policies, customs, and practices governing the conduct of its police officers.

12. Service on Defendant City of Austin: Pursuant to Federal Rule of Civil Procedure 4(j)(2), the City of Austin may be served by delivering a copy of the summons and complaint to its chief executive officer. Service shall be made upon T.C. Broadnax, City Manager, City of Austin, at 301 W. 2nd Street, 3rd Floor, Austin, Texas 78701.

13. Plaintiff asserts no Texas common-law tort claims against the City of Austin. Plaintiff brings the City of Austin into this action solely under 42 U.S.C. § 1983 on the grounds of municipal liability under the doctrine articulated in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Plaintiff asserts Texas common-law tort claims, if any, only against the individual officers in their individual capacities.

## IV.    FACTUAL ALLEGATIONS

### A.  The Incident of July 30, 2024

14. On July 30, 2024, at approximately 9:45 p.m., Mr. Alexander was lawfully present in the area of East Oltorf Street and Parker Lane in Austin, Texas.

15. Mr. Alexander crossed Parker Lane mid-block (approximately 20 yards south of a crosswalk), causing a northbound vehicle to yield to him as he traversed the roadway. Officers Kirchberg and Alvarez later cited this crossing as a violation of Texas Transportation Code § 552.005 (crossing at a point other than a crosswalk).

16. Defendants Kirchberg and Alvarez, operating together as a two-officer unit (Unit H302) in a marked patrol vehicle, observed Mr. Alexander crossing the street and decided to effectuate a stop.[1]  Officers Kirchberg and Alvarez activated their emergency lights and exited their patrol vehicle in the area of East Oltorf Street and Parker Lane.

19. Mr. Alexander had just finished crossing the street and was near a bus stop when the officers made a U-turn, stopped, and parked with their emergency lights activated.  Mr. Alexander was unarmed and posed no immediate threat to the officers. As the officers exited their patrol vehicle, one officer called out to Mr. Alexander by stating " hey red hoodie." Mr. Alexander looked toward the officers and immediately raised his hands, with his palms visibly open and facing outward, demonstrating that he was unarmed and attempting to comply. This is clearly observable on the body-worn camera footage.

20. Before providing any complete or meaningful explanation for the detention, Defendant Alvarez reached toward Mr. Alexander's waistband area.[2]  When Mr. Alexander took a single step backward in response—an instinctive reaction to an officer reaching toward his person without explanation—Defendant Alvarez seized Mr. Alexander's left wrist while Defendant Kirchberg simultaneously seized his right wrist. The officers then executed a coordinated takedown maneuver, using forward momentum and control of Mr. Alexander's upper extremities to force him to the ground, resulting in Mr. Alexander being driven chest-first onto the concrete surface[3].

### B.  The Unlawful Takedown and Excessive Force

26. Once Mr. Alexander was on the ground, Defendant Alvarez mounted him and placed his full body weight on Mr. Alexander's back and torso. Alvarez's own supplement narrative states: "I immediately went around Officer Kirchberg and Alexander in order to grab his right arm/wrist and roll him to his stomach... I grabbed a hold of his left bicep/inner elbow area... I pulled it out from under him as I simultaneously threw my

---

[1] Both officers later characterized the area as "a high crime area known for illegal narcotic activity" and stated that they had "personally made numerous controlled substance arrests, Delivery of Controlled arrests, and illegal possession of firearm arrests in this area." Plaintiff alleges that the decision to stop him for a minor pedestrian infraction was pretextual and part of a pattern of aggressive policing targeting individuals in areas the officers characterized as "high crime" locations.

[2] Although officers later reported that Mr. Alexander reached toward his own waistband, the video evidence shows that Mr. Alexander's hands were raised and visible immediately prior to the officers' physical contact.

[3] Internal Affairs records, as documented in the Class D memorandum, confirm that Mr. Alexander was not provided an explanation for the stop until after he had been taken to the ground, restrained, and placed in handcuffs—approximately one minute after officers initiated physical contact. This sequence confirms that Mr. Alexander was physically seized through a forceful takedown prior to receiving any meaningful notice of the legal justification for the detention.

body weight in a side downward motion using my legs for propulsion... I was able to get Alexander onto his stomach and I mounted Alexander locking my legs/feet around his waist/leg area as I stayed low and maintained full body contact."

27. Defendant Alvarez applied pressure to Mr. Alexander's upper back with his forearm and subsequently with his knee and shin, pinning him to the pavement. Alvarez stated: "I proceeded to used my forearm and placed it on his upper back and I applied positive pressure downwards... I removed my right leg hook from Alexander's right side as I maintained positive downward pressure on his upper back using my forearm, then my whole hand, and finally my right knee/shin and I pivoted to his left side."

28. The Force Review Unit noted that "from the in-car dash-camera there was a point that it appeared Alvarez had his arm around Alexander's neck area for a moment. However, from Kirchberg's BWC angle it appears that Alvarez's arm is around Alexander's shoulder area—what is sometimes referred to as a seatbelt hold.

29. After Mr. Alexander was handcuffed, officers relocated him to an alternate location northbound on Parker Lane, described as an apartment parking lot. This relocation occurred after bystanders who had witnessed the incident gathered at the original location, expressing visible concern and alarm over the force used against Mr. Alexander, who was already restrained and under control.

30. As officers departed the original scene with Mr. Alexander in handcuffs, an unidentified individual threw an object that struck a patrol vehicle, causing damage to a window. This isolated act occurred after Mr. Alexander had been restrained and removed from the immediate area and was not attributable to Mr. Alexander or to the bystanders as a group. Rather, it followed a public use of force that multiple witnesses had just observed and reacted to in real time.

31. Mr. Alexander was transported to the Travis County Jail and charged with Resisting Arrest, Search, or Transportation under Texas Penal Code § 38.03(a). Officers described the charge as resisting a "search" or "frisk."

## C. The Criminal Case and Its Dismissal

36. A charge was filed against Mr. Alexander for Resisting Arrest, in the County Court at Law of Travis County under Cause Number C1CR24208181. The Travis County Attorney's Office subsequently dismissed the criminal case against Mr. Alexander without prosecution, for lack of sufficient evidence.

## D. Injuries Sustained by Plaintiff

39. As a direct and proximate result of Defendants' conduct, Mr. Alexander sustained serious physical injuries, including a fracture to his right leg, as well as pain and soreness to his neck, shoulder, and other parts of his body where he made contact with the ground and was subjected to compression by officers' body weight and pressure points. These injuries have resulted in permanent impairment and ongoing physical limitations.

40. Mr. Alexander was photographed by officers following the incident, and those photographs documenting his injuries were submitted to the Austin Police Department's evidence system via AxonCapture.

41. Beyond his physical injuries, Mr. Alexander has suffered and continues to suffer severe emotional distress, humiliation, anxiety, fear, and damage to his reputation and standing as a result of being violently arrested and criminally charged for alleged "resisting" conduct that was motivated by fear and confusion, and for a crime that was ultimately dismissed.

## V.    DEFENDANT KIRCHBERG'S DOCUMENTED PATTERN OF MISCONDUCT AND THE CITY'S NOTICE

### A. Twenty-Five Internal Affairs and OPO Investigations (January 2023 – July 2025)

43. Defendant Kirchberg has been the subject of extraordinary scrutiny by the Austin Police Department's Internal Affairs Division and the Office of Police Oversight due to a documented, extensive pattern of misconduct spanning a 30-month period.

44. Between January 1, 2023, and July 31, 2025, the Internal Affairs Division and OPO conducted twenty-five (25) separate investigations into Defendant Kirchberg's actions and conduct. Of those investigations, nine (9) were internal APD investigations and sixteen (16) were external complaints initiated through the Office of Police Oversight.

45. Five (5) of the nine (9) internal investigations resulted in "sustained" findings, meaning that Defendant Kirchberg was found to have violated departmental policy.

### B. The Five Sustained Policy Violations

46. The five sustained violations included the following policies and dates:

   a. Section 215 (Foot Pursuit) – sustained May 22, 2023, resulting in oral reprimand
   b. Section 214.4 (Pursuit Guidelines) – sustained October 13, 2023, resulting in written reprimand
   c. Section 804.2 (General Operations of Department Vehicles) – sustained March 12, 2024, resulting in written reprimand
   d. Section 803.2 (Safe Handling of Firearms/Storage) – sustained April 7, 2024, resulting in written reprimand
   e. Section 804.1 (General Operation of Department Vehicles) – sustained December 26, 2024, with discipline pending as of the OPO memorandum dated August 19, 2024

47. An additional investigation regarding Section 301.2 (Impartial Attitude & Courtesy) in April 2025 was administratively closed with training provided but no formal discipline.

### C. The August 19, 2024 OPO Memorandum of Concern: Explicit Notice to City Leadership

48. On August 19, 2024 just twenty (20) days after the incident involving Mr. Alexander on July 30, 2024 the Director of the Office of Police Oversight issued a formal Memorandum of Concern to APD Chief Lisa Davis regarding Defendant Kirchberg.

49. The Memorandum stated explicitly that Defendant Kirchberg "has exhibited a pattern of behavior and decision-making that may not align with the training and standards APD expects from its officers."

50. The Memorandum further noted that "Kirchberg has received five sustained findings, some involving allegations of a similar nature; however, he was not subjected to progressive discipline intended to remediate the behavior. This suggests that his chain of command has not adequately held him accountable for his inappropriate conduct and decision-making."

51. Most significantly, the Memorandum observed that while Defendant Kirchberg's peer officers engaged in equally proactive policing in the same sector, those officers "receive[d] far fewer internal and external complaints," indicating that Defendant Kirchberg's methods and decision-making were "an outlier."

52. The OPO Director specifically recommended "a comprehensive review of Kirchberg's complaint history and the post-investigation actions taken by his chain of command to ensure compliance with departmental standards."

53. The Memorandum of Concern was issued before the Force Review Unit initiated its review of this incident, and it warned that Officer Kirchberg's conducts raised concerns regarding compliance with APD training, standards, and accountability.

## D. City's Receipt of Explicit Notice

54. The August 19, 2024 Memorandum of Concern placed APD leadership on notice of OPO's concerns regarding Officer Kirchberg's complaint history and accountability within his chain of command.

55. The Memorandum identified five sustained policy violations over a 20-month period (May 2023–December 2024), a pattern of inadequate progressive discipline, and the officer's status as an "outlier" in terms of the volume and nature of complaints against him despite comparable proactive policing by peer officers.

56. The Memorandum of Concern is dated August 19, 2024, and Mr. Alexander's complaint was received by OPO on August 6, 2024 and forwarded to Internal Affairs on August 14, 2024.

57. The OPO Memorandum of Concern recommended that APD leadership review Officer Kirchberg's complaint history and post-investigation actions taken by his chain of command. Plaintiff alleges that APD's subsequent handling of Mr. Alexander's complaint closure as Class D with no further IA investigation reflects inadequate accountability.

## VI.    THE CITY'S FAILURE TO INVESTIGATE, CLASSIFY AS "CLASS D," AND CLOSE ADMINISTRATIVELY

## A. OPO Identification of Potential Policy Violations

58. On August 6, 2024, the Office of Police Oversight received a telephone complaint from Mr. Alexander regarding the July 30, 2024 incident. A signed affidavit was submitted on August 14, 2024, and the complaint was forwarded to Internal Affairs on August 14, 2024.

59. The Office of Police Oversight explicitly identified potential violations of multiple Austin Police Department General Orders, including:

  a. General Order 200.2.1 (Assessment and De-Escalation);
  b. General Order 200.4.1 (Determining the Objective Reasonableness of Force);
  c. General Order 306.9 (Frisk/Pat-Down for Weapons).

## B. Internal Affairs Class D Designation and Administrative Closure

60. Despite the OPO's identification of these potential policy violations, the Internal Affairs Division classified the complaint as "Class D" under General Order 902.3.1.

61. According to the Internal Affairs memorandum dated October 1, 2024 (signed by Jeremy Compton, IA Commander), a Class D complaint is defined as one in which "a review of this complaint has indicated no violations of Departmental Policy."

62. The Class D designation meant that the case was "being sent to [the chain of command] for administrative purposes only" and that "Internal Affairs will retain this original memo in order to close the complaint administratively and no further investigation will occur."

63. The Internal Affairs memorandum concluded that "No Department policies or procedures were violated by the officer in relation to the complaint received" and that the complaint would be closed administratively with no further investigation.

## C. Contradictions Between the Class D Conclusion and the Record

64. The Class D administrative closure conclusion contradicts the factual and evidentiary record:

  a. De-escalation (GO 200.2.1): The OPO complaint alleged Mr. Alexander was "scared and fearful for his life during the incident because he was never told by Officer Alvarez why he was being contacted or why he was being detained." Verified police records confirm that Mr. Alexander was provided an explanation only after being handcuffed approximately one minute after physical contact. A tactical response that involves immediate physical seizure without explanation, escalating to a takedown shortly after officers made physical contact, is inconsistent with de-escalation protocols.

  b. Reasonableness of Force (GO 200.4.1): The facts as documented in officer narratives and FRU materials show that Mr. Alexander took steps away and pulled his hands away, and that once on the ground he continued to stiffen his body and pull his arms away while officers attempted to handcuff him. For a minor pedestrian traffic violation, where the subject was unarmed and posed no threat, a takedown and prone restraint raise serious questions about objective reasonableness.

  c. Frisk Procedures (GO 306.9): The complaint alleged Mr. Alexander was never told why he was being frisked. Officer narratives confirm the frisk was conducted after the takedown and restraint, not before.

65. The Force Review Unit separately concluded that "the Officers Response to Resistance complies with law and departmental policy," but the FRU's own narrative documents

that Mr. Alexander's resistive actions were "backing away and pulling his hands away" and "stiffening his body."

## D. Systemic Pattern: Class D as Mechanism for Closure Without Accountability

66. In this matter, Internal Affairs designated the complaint "Class D" and closed it administratively, stating that "no further investigation will occur." Plaintiff alleges, upon information and belief, that similar administrative closures reflect deficiencies in APD's accountability systems that contribute to unconstitutional policing.

67. In Mr. Alexander's case, the Versadex General Offense report shows that Officer Kirchberg reported the offenses as:

   i.    1400-0 Criminal Mischief (completed)

   ii.   0905-0 Resisting Arrest or Search (completed)

   iii.  8403-0 Level 3 Response to Resistance (completed)

Yet the complaint against the officers for those same events was classified as "Class D No Policy Violations." This pattern charging a citizen with crimes arising from police force, while simultaneously closing the complaint against the officers as non-violative of policy suggests a systemic approach to insulating officers from accountability.

## E. Ratification by Class D Administrative Closure

68. The City's classification of Mr. Alexander's complaint as "Class D" and its administrative closure without further investigation, despite the OPO's identification of potential policy violations and Kirchberg's known pattern of conduct, constitutes a ratification of the officers' conduct.

69. By closing the complaint without investigation, the City conveyed to its officers (and particularly to Officer Kirchberg) that the conduct at issue immediate physical seizure without explanation, a takedown for backing away during a minor traffic stop, and prone restraint with body-weight pressure was consistent with departmental policy and acceptable.

## VII.    DELIBERATE INDIFFERENCE: FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE

## A. Actual and Constructive Notice of Substantial Risk

70. The City of Austin is liable for the constitutional violations suffered by Mr. Alexander based on deliberate indifference to a substantial risk of future constitutional violations by Officer Kirchberg.

71. The City was on actual and explicit notice through the August 19, 2024 OPO Memorandum of Concern that Officer Kirchberg exhibited:

   i.    A documented pattern of policy violations (five sustained findings over 20 months)

   ii.   A pattern of inadequate progressive discipline (multiple violations without escalated corrective action)

   iii.  Status as an "outlier" despite comparable proactive policing by peer officers

iv.   A substantial risk of continued problematic conduct if accountability systems were not strengthened

72. The City was further on notice through the subsequent processing and Class D designation of Mr. Alexander's complaint (which itself involved a takedown and prone restraint during a minor traffic stop) that IA's accountability processes were permitting such conduct to be characterized as policy-compliant.

## B. Failure to Implement Corrective Measures

73. Despite receiving explicit notice of Officer Kirchberg's pattern and the risk of future violations, the City implemented no corrective action, including but not limited to:

   a. No enhanced supervision or field oversight of Kirchberg's stops or use of force;
   b. No mandatory retraining on de-escalation, frisk procedures, or the constitutional limits on seizure and force for minor offenses;
   c. No restriction on Kirchberg's independent patrol or assignment to "high crime" areas where he engaged in proactive stops;
   d. No progressive discipline scheme that would deter repeated violations or signal to Kirchberg that his pattern was unacceptable;
   e. No structural review of his chain of command's inadequate response to prior sustained findings.

74. The OPO Director's August 19, 2024 recommendation for "a comprehensive review of Kirchberg's complaint history and the post-investigation actions taken by his chain of command" was not implemented.

## C. Custom and Practice of Inadequate Accountability Mechanisms

75. The City's Class D administrative closure process, combined with its failure to implement progressive discipline for sustained violations and its failure to enhance supervision of known-problem officers, constitutes a custom and practice of inadequate accountability.

76. This custom and practice permitting officers with multiple sustained violations to continue unrestricted patrol with minimal supervision or corrective training creates and perpetuates a substantial risk that such officers will commit further constitutional violations.

## D. Causation: The Pattern Created the Conditions for Alexander's Injury

77. Had the City implemented adequate progressive discipline, retraining, and supervision in response to Kirchberg's prior sustained violations and the OPO's August 2024 warning, Kirchberg would have been subject to heightened oversight, mandatory de-escalation training, and accountability mechanisms that would have deterred or prevented the conduct that injured Mr. Alexander.

78. Instead, the City's inaction (and the subsequent Class D closure of Mr. Alexander's own complaint) conveyed to Officer Kirchberg that his conduct was acceptable, thereby removing a significant deterrent to future violations.

## VIII.   CONTROLLING LEGAL STANDARDS

### A.  Excessive Force Under the Fourth Amendment

79. Excessive-force claims arising from an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness inquiry is objective and considers the facts and circumstances confronting the officers, without regard to their underlying intent or motivation. *Id.* at 396–97.

80. The Fifth Circuit has repeatedly held that officers violate clearly established law when they abruptly use overwhelming physical force against a nonviolent, non-fleeing individual stopped for a minor offense. *Hanks v. Rogers*, 853 F.3d 738, 747–48 (5th Cir. 2017) (holding force unconstitutional where officer tackled a motorist stopped for a minor traffic violation who posed no immediate threat); *Trammell v. Fruge*, 868 F.3d 332, 341–42 (5th Cir. 2017) (finding excessive force where officers took a non-aggressive individual to the ground for pulling his arm away); *Timpa v. Dillard*, 20 F.4th 1020, 1033–35 (5th Cir. 2021) (holding continued force on a subdued, non-threatening individual unconstitutional and clearly established).

81. Courts evaluate the reasonableness of force by considering: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or the public; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396.

82. When a suspect is already subdued and restrained on the ground, subsequent force particularly force involving pressure applied to the back, body weight, or threats of additional force (such as tasing) may be excessive and constitute a constitutional violation.

### B.  Investigatory Stop and Frisk

83. An officer may conduct a brief investigatory detention only when supported by reasonable suspicion that a person has committed, is committing, or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1 (1968).

84. A brief detention must be supported by reasonable suspicion based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Absent such facts, stopping a pedestrian violates the Fourth Amendment. *Brown v. Texas*, 443 U.S. 47, 52 (1979). A seizure that escalates beyond the scope justified by the underlying offense is likewise unconstitutional.

85. A frisk for weapons is permitted only when the officer reasonably believes the person may be armed and presently dangerous. *Terry*, 392 U.S. at 27.

### C.  Municipal Liability Under Monell

86. A municipality is liable under 42 U.S.C. § 1983 when an official policy or custom is the moving force behind a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Deliberate indifference may be shown where policymakers have notice of a pattern of similar constitutional violations and fail to take corrective action. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bd. of County Comm'rs v. Brown*,

520 U.S. 397, 407 (1997). The Fifth Circuit requires a showing that municipal policymakers were aware of prior similar misconduct and nonetheless failed to supervise or discipline offending officers. *Peterson v. City of Fort Worth*, 588 F.3d 838, 850–51 (5th Cir. 2009); *Hicks-Fields v. Harris County*, 860 F.3d 803, 810–11 (5th Cir. 2017).

87. A municipality may also be held liable when it exhibits deliberate indifference to a substantial risk of future constitutional violations by its employees. *Id.*; *City of Canton v. Harris*, 489 U.S. 378 (1989).

88. To establish municipal liability for deliberate indifference, a plaintiff must show: (1) actual or constructive notice of a substantial risk that a particular officer or class of officers would commit constitutional violations; (2) the municipality's deliberate indifference to that risk; and (3) a direct causal link between the municipality's inaction and the plaintiff's injury.

89. At the time of the incident, it was clearly established in the Fifth Circuit that officers may not resort to a forcible takedown or sustained body-weight restraint against a nonviolent, non-fleeing person who poses no immediate threat. See *Hanks v. Rogers*, 853 F.3d at 747; *Trammell v. Fruge*, 868 F.3d at 342. The unlawfulness of such force was therefore beyond debate, and Defendants are not entitled to qualified immunity.

## IX.    CAUSES OF ACTION

## COUNT I: 42 U.S.C. § 1983 — UNLAWFUL SEIZURE AND ARREST IN VIOLATION OF THE FOURTH AMENDMENT

*(Against Defendants Ryne Kirchberg and Shalom Alvarez, individually)*

90. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

91. The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, protects individuals from unreasonable searches and seizures. *U.S. Const. amend. IV*.

92. A seizure of a person occurs when a law enforcement officer restrains an individual's freedom of movement through the means intentionally applied, by force or threat of force. *Graham*, 490 U.S. at 395.

93. To justify an investigatory detention (a "stop"), an officer must possess reasonable suspicion that the individual has committed, is committing, or is about to commit a crime. *Terry*, 392 U.S. at 27.

94. To justify an arrest, an officer must possess probable cause to believe that the individual has committed a crime.

95. Defendants Kirchberg and Alvarez unlawfully seized Mr. Alexander by:

    a.  Physically grabbing his wrists and arms without providing an explanation for the stop;

    b.  Executing a takedown maneuver, driving him to the ground;

    c.  Mounting him and applying sustained pressure to his back while handcuffing him;

    d. Transporting him to jail and charging him with a crime.

96. The officers reported the stop was for a pedestrian traffic violation (Texas Transportation Code § 552.005). Plaintiff alleges that, under the totality of circumstances shown in the reports and videos referenced in the FRU/IA materials, the manner and degree of force used were objectively unreasonable.

97. Plaintiff alleges that even if the officers possessed reasonable suspicion for an investigatory stop based on the pedestrian traffic violation, they violated the Fourth Amendment by:

    a. Failing to provide Mr. Alexander with an explanation for the stop before initiating physical contact;
    b. Responding to his step backward (a non-resistive, fear-based movement) and stiffening of his body (a fear response) with a takedown maneuver, rather than with further de-escalation or verbal commands;
    c. Employing a degree and duration of force grossly disproportionate to the minor nature of the alleged violation and the absence of any threat posed by an unarmed individual.

98. The criminal case identified as State of Texas v. Antonio Alexander, Cause No. C1CR24208181, was dismissed. Plaintiff alleges that, based on the circumstances documented in APD records and Plaintiff's complaint, the officers lacked probable cause for the arrest.

99. The seizure and arrest of Mr. Alexander violated the Fourth Amendment.

100. As a direct and proximate result of Defendants' unlawful seizure, Mr. Alexander suffered:

    a. Deprivation of liberty;
    b. Physical injury;
    c. Emotional distress;
    d. Humiliation and damage to reputation;
    e. Criminal prosecution and the lasting collateral consequences thereof.

## COUNT II: 42 U.S.C. § 1983 — EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT

*(Against Defendants Ryne Kirchberg and Shalom Alvarez, individually)*

101. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

102. The Fourth Amendment prohibits law enforcement officers from using excessive force when effecting a seizure or arrest. *Graham*, 490 U.S. at 394.

103. The reasonableness of force is determined by balancing the government's interest in seizure against the individual's liberty interest, using an objective standard that considers:

    a. The severity of the crime at issue;
    b. Whether the suspect poses an immediate threat to the safety of officers or the public;
    c. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396.

104. The officers stated they stopped Mr. Alexander for a pedestrian traffic violation, specifically Texas Transportation Code § 552.005 (crossing at a point other than a crosswalk).

105. Mr. Alexander was unarmed, and according to his complaint narrative, displayed his hands to show compliance. Officer narratives confirm he was armed with nothing.

106. Mr. Alexander's actions were:

   a. Taking a step backward when officers reached for him without explanation (a natural fear response);
   b. Tensing his body in fear as officers seized his wrists (a fear response);
   c. Stiffening his body and pulling his arms as officers attempted to handcuff him while he was prone on the ground (resistance to continued restraint).

107. The FRU's own characterization of his conduct was "Defensive Resistance" and "backing away and pulling his hands away." Plaintiff alleges these are not the actions of a person actively resisting arrest; they are the actions of a confused, frightened person being seized without explanation by armed officers.

108. Defendants' use of a takedown maneuver to drive Mr. Alexander to the pavement when he posed no threat, was unarmed, posed no flight risk, and was backing away in fear was objectively unreasonable under the circumstances. *Graham*, 490 U.S. at 396.

109. The subsequent application of body weight, forearm pressure, knee pressure, and shin pressure to Mr. Alexander's back while he was prone and being handcuffed was objectively unreasonable and not proportionate to any legitimate law enforcement need or to the minor nature of the alleged infraction. *Graham*, 490 U.S. at 396.

110. Defendants' threats to deploy a taser against a prone suspect further demonstrate the unreasonableness of the force employed.

111. As a direct and proximate result of Defendants' use of excessive force, Mr. Alexander suffered:

   a. Physical injuries including pain and injury to his neck, shoulder, and other body parts;
   b. Lasting pain and discomfort;
   c. Emotional trauma and ongoing psychological injury;
   d. Humiliation and loss of dignity.

## COUNT III: 42 U.S.C. § 1983 — MUNICIPAL LIABILITY FOR DELIBERATE INDIFFERENCE

*(Against Defendant City of Austin, Texas)*

112. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

113. A municipality may be held liable under 42 U.S.C. § 1983 when a constitutional violation results from the municipality's policy, custom, or practice, or when the municipality exhibits deliberate indifference to the constitutional rights of individuals in its custody or under the force of its agents. *Monell*, 436 U.S. at 694; *City of Canton*, 489 U.S. at 390.

114. The City of Austin is liable under *Monell* for the constitutional violations committed by Defendants Kirchberg and Alvarez because those violations resulted from:

A. Custom and Practice of Inadequate Investigation and Administrative Closure Without Accountability

115. In Mr. Alexander's case, the OPO specifically identified three potential policy violations:

    i.   General Order 200.2.1 (Assessment and De-Escalation)
    ii.  General Order 200.4.1 (Determining the Objective Reasonableness of Force)
    iii. General Order 306.9 (Frisk/Pat-Down for Weapons)

    Yet Internal Affairs classified the complaint "Class D" and closed it with a finding of "no violations."

116. This classification designating OPO-flagged complaints as "Class D" and administratively closing them without investigation is evidence of inadequate accountability processes that result in officers not being held accountable for potentially unconstitutional conduct.

B. **Failure to Implement Progressive Discipline Despite Sustained Findings**

117. Despite five sustained findings against Officer Kirchberg between May 2023 and December 2024 (spanning policy violations in pursuits, vehicle operations, and firearms handling), the City failed to subject him to progressive discipline intended to remediate his behavior.

118. The OPO Director explicitly noted: "Kirchberg has received five sustained findings, some involving allegations of a similar nature; however, he was not subjected to progressive discipline intended to remediate the behavior. This suggests that his chain of command has not adequately held him accountable for his inappropriate conduct and decision-making."

119. The City's failure to implement progressive discipline is a custom and practice that permits officers with documented patterns of misconduct to continue unrestricted patrol, thereby creating conditions that enable future constitutional violations.

C. **Failure to Supervise Officers with Known Patterns of Misconduct**

120. The City was on actual and explicit notice through the August 19, 2024 OPO Memorandum of Concern that Officer Kirchberg was an "outlier" whose "pattern of behavior and decision-making may not align with the training and standards APD expects," and whose peer officers engaged in comparable proactive policing yet received "far fewer internal and external complaints."

121. Despite this notice, the City failed to implement any enhanced supervisory measures, including:

    a. Field supervision or oversight of Kirchberg's investigatory stops and use of force;
    b. Mandatory retraining on constitutional limits, de-escalation, and frisk procedures;
    c. Restrictions on his independent patrol or reassignment to areas where he engaged in aggressive proactive policing;

d. Any measure calculated to remediate the pattern or mitigate the risk of future violations.

## D. Deliberate Indifference to Substantial Risk of Future Constitutional Violations

122. The City of Austin was on actual and explicit notice of a substantial risk that Officer Kirchberg would commit constitutional violations through:

a. Twenty-five separate investigations into his conduct (nine internal, sixteen external) within 30 months;
b. Five sustained findings of policy violations within a 20-month period (May 2023–December 2024);
c. The August 19, 2024 OPO Memorandum of Concern explicitly warning of a pattern of problematic behavior and inadequate accountability;
d. The subsequent processing and Class D administrative closure of Mr. Alexander's complaint (which itself involved force during a minor stop), signaling that the conduct was not being investigated as potentially unconstitutional.

123. The City's deliberate indifference its failure to implement corrective action, progressive discipline, enhanced supervision, or retraining despite this explicit notice created the conditions under which Officer Kirchberg committed the constitutional violations that injured Mr. Alexander.

124. The City's inaction (and the Class D closure of Mr. Alexander's complaint) removed a significant deterrent to Officer Kirchberg's continued misconduct, thereby contributing directly to the violation of Mr. Alexander's constitutional rights.

## E. Moving Force

125. The City's custom and practice of inadequate investigation, failure to implement progressive discipline, and failure to supervise officers with known patterns of misconduct was the moving force behind the constitutional violations suffered by Mr. Alexander. *Monell*, 436 U.S. at 694.

126. Had the City implemented adequate accountability mechanisms, progressive discipline, and supervision in response to Kirchberg's prior sustained violations and the OPO's August 2024 warning, the constitutional violations against Mr. Alexander would not have occurred, or would have been substantially less likely to occur.

127. As a direct and proximate result of the City of Austin's deliberate indifference to the substantial risk of constitutional violations by Officer Kirchberg, Mr. Alexander was deprived of his rights under the Fourth and Fourteenth Amendments and suffered the injuries detailed above.

128. The City's continued administrative closure of force complaints without investigation, despite notice of repeated sustained findings, reflects a persistent and widespread practice sufficient to constitute municipal policy under *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009).

### COUNT IV: ASSAULT AND BATTERY UNDER TEXAS LAW

*(Against Defendants Ryne Kirchberg and Shalom Alvarez, individually)*

129. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

130. Under Texas Penal Code § 22.01(a)(1), a person commits assault if the person intentionally or knowingly causes bodily injury to another, or intentionally or knowingly threatens another with imminent bodily injury.

131. Under Texas common law, battery occurs when a person intentionally and unlawfully causes harmful or offensive contact with another without consent.

132. Defendants Kirchberg and Alvarez intentionally caused harmful and offensive physical contact with Mr. Alexander by:

   a. Grabbing and seizing his wrists and arms;
   b. Executing a takedown maneuver and driving him to the pavement;
   c. Mounting and placing body weight and pressure on his back and torso;
   d. Applying forearm, knee, and shin pressure to his body while he was prone and restrained.

133. Defendants' actions caused bodily injury to Mr. Alexander, including pain, soreness, and physical trauma to his neck, shoulder, and other body parts.

134. Defendants' actions were not justified by law. Mr. Alexander posed no threat, the force employed was not reasonable under the circumstances, and the manner of seizure and restraint was unconstitutional and tortious.

135. Mr. Alexander did not consent to the contact, and Defendants knew or should have known that their actions would cause bodily injury.

136. As a direct and proximate result of Defendants' assault and battery, Mr. Alexander suffered:

   a. Physical injury and pain;
   b. Emotional distress;
   c. Humiliation and loss of dignity.


## COUNT V: FALSE ARREST AND FALSE IMPRISONMENT UNDER TEXAS LAW

*(Against Defendants Ryne Kirchberg and Shalom Alvarez, individually)*

137. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

138. Under Texas common law, a person commits false imprisonment if the person intentionally or knowingly restrains another without legal authority or justification.

139. Under Texas common law, false arrest occurs when a person is arrested without probable cause.

140. Defendants Kirchberg and Alvarez intentionally restrained Mr. Alexander's liberty by:

   a. Physically seizing him without explanation;
   b. Executing a takedown and driving him to the ground;
   c. Applying sustained restraint and pressure while handcuffing him;
   d. Transporting him to the Travis County Jail;
   e. Booking him on charges of Resisting Arrest, Search, or Transportation.

141. The criminal case (Cause No. C1CR24208181) was dismissed by the Travis County Attorney's Office. Plaintiff alleges that Defendants lacked probable cause to arrest Mr. Alexander for Resisting Arrest, Search, or Transportation.

142. Mr. Alexander did not consent to his detention or arrest.

143. The detention and arrest were unlawful and without legal justification.

144. As a direct and proximate result of Defendants' false arrest and false imprisonment, Mr. Alexander suffered:

   a. Deprivation of liberty;
   b. Emotional distress and trauma;
   c. Humiliation and damage to reputation;
   d. Collateral consequences of criminal arrest and prosecution.

## X.   DAMAGES

145. As a direct and proximate result of Defendants' unlawful conduct, Mr. Alexander is entitled to recover the following damages:

A. Compensatory Damages

   1. Physical pain and suffering from his injuries and the ongoing effects thereof;

   2. Medical and related expenses incurred in treating injuries sustained during the incident;

   3. Emotional distress and trauma, including fear, anxiety, humiliation, and lasting psychological injury;

   4. Lost wages and income resulting from any inability to work due to physical injury or emotional distress;

   5. Damage to reputation and standing in the community as a result of arrest and criminal prosecution;

   6. Collateral consequences of criminal arrest and prosecution, including impacts on employment, housing, educational opportunities, and other life opportunities.

B. **Punitive Damages**

   1. Against Defendants Kirchberg and Alvarez (individually): Punitive damages in an amount sufficient to deter similar conduct, reflecting the egregious nature of the conduct (seizure without explanation, takedown during a minor traffic stop, prone restraint with body weight and pressure threats), the deliberate or reckless disregard for constitutional protections, and the need for deterrence.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Antonio Isaac Alexander prays that this Court grant him the following relief:

A. Judgment against Defendants Ryne Kirchberg and Shalom Alvarez, individually, for all compensatory damages including but not limited to past and

future pain and suffering, medical expenses, emotional distress, lost wages, reputational harm, and collateral consequences, in an amount to be proven at trial, jointly and severally;

B. Punitive damages against Defendants Ryne Kirchberg and Shalom Alvarez, individually, in an amount sufficient to punish their conduct and deter similar violations by other officers, in an amount to be proven at trial, jointly and severally;

C. Judgment against Defendant City of Austin, Texas, for all compensatory damages, including but not limited to past and future pain and suffering, medical expenses, emotional distress, lost wages, reputational harm, and collateral consequences, in an amount to be proven at trial;

D. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

E. Attorney's fees and costs incurred in prosecution of this action, including expert witness fees, under 42 U.S.C. § 1988;

F. A jury trial on all issues;

G. Such other and further relief as the Court deems just and proper.

## XII.   JURY DEMAND

Plaintiff Antonio Isaac Alexander hereby demands a trial by jury on all issues in this case, as permitted by the Seventh Amendment to the United States Constitution and the Federal Rules of Civil Procedure.

Respectfully submitted,

TOLBERT & ASSOCIATES, PLLC

By:_____/s/Christopher L. Tolbert_____
Christopher L. Tolbert, Esq., LLM
State Bar No. 24080530
511 E. John W Carpenter Fwy Suite 500
Las Colinas, Texas 75206
817.380.8008 (Office)
Fax: 817.977.9661
chris@tolbertlawpc.com
*Attorney For Plaintiffs*